CRUCIBLE, INC., a Delaware
corporation, Plaintiff,

v.

STORA KOPPARBERGS BERGSLAGS
AB, a Swedish corporation, and Udde-
holms AB, a Swedish corporation, De-
fendants.

STORA KOPPARBERG CORPORATION,
a New York corporation, and Udde-
holm Steel Corporation, a New York
corporation, Plaintiffs,

v.

CRUCIBLE, INC. a Delaware
corporation, Defendant.

Civ. A. Nos. 74–917, 74–1062.

United States District Court,
W.D. Pennsylvania.

Sept. 19, 1984.

Ford F. Farabow, Jr., Laurence R. Hefter, Michael C. Elmer, Allen M. Sokal, Finnegan, Henderson, Farabow, Garret & Dunner, Washington, D.C., Frederick J. Francis, Meyer, Unkovic & Scott, Pittsburgh, Pa., for plaintiff Crucible, Inc.

Stuart A. White, Crutis, Morris & Safford, New York City, John M. Webb, Webb, Burden, Robinson & Webb, Paul J. Leventon, Leventon & Leventon, Pittsburgh, Pa., for defendants.

OPINION

DIAMOND, District Judge.

In these consolidated suits, plaintiff Crucible, Inc. (hereafter "plaintiff" or "Crucible") seeks to enforce claim 30 of U.S. Patent No. 3,746,518 (hereafter sometimes "the *Holtz* patent") and claim 4 of U.S. Patent No. 3,561,934 (hereafter sometimes "the *Steven* patent") against a group of corporately related defendants, Stora Kopparberg Corporation, Uddeholm Steel Corporation, Stora Kopparbergs Bergslags AB and Uddeholms AB (hereafter collectively referred to as "defendants" or "Stora/Uddeholm" or "Stora"). Crucible seeks an injunction against sales of Stora/Uddeholm's infringing products (hereafter "ASP" products) and a determination of willful and intentional infringement. Related antitrust and damage issues have been severed for a later trial.

The *Holtz* and *Steven* patents protect powder metallurgy cutting tool products. Crucible contends that *Holtz* represents a powder metallurgy cutting tool breakthrough because *Holtz* allegedly achieved both full density and a superior microstructure including a uniform distribution of ultrafine carbides less than 3 microns in size, which combination plaintiff alleges had eluded all prior art investigators. *Steven* teaches a so-called hob having superior size change uniformity, a long-standing problem in the hob industry, according to the plaintiff.

There are four general issues that must be decided with respect to *Holtz* claim 30:

1. Is it valid?

2. Is it infringed?

3. Is its infringement willful and intentional?

4. Was fraud committed during prosecution of the *Holtz* patent?

The defendants contend that the specific issues, which they refer to as the "four dominant issues," are:

1) Is claim 30 restricted to cutting tools?

2) Is 3 microns a critical carbide size?

3) Are ASP powders a supersaturated solid solution?

4) Is HIPing equivalent to hot-working?

With respect to validity, this litigation was stayed for almost six years so that the United States Patent and Trademark Office (hereafter sometimes "PTO") could rule on virtually the same validity issues in connection with a subsequent related *Holtz* application, which was contested by Stora/Uddeholm in *inter partes* proceedings before the PTO. At trial, Stora/Uddeholm agreed that the PTO Board of Appeals decision on patentability should be accorded "great weight." Agreed Finding 9. In addition, our ruling on the fraud issue has been delayed pending a decision of the PTO Board of Appeals, where the parties to the case *sub judice* litigated, inter alia, the issue of fraud or gross negligence in the prosecution of the *Holtz* patent. The PTO Board of Appeals rendered its decision on April 25, 1984, finding insufficient evidence of fraud or of culpability under 37 C.F.R. 1.56 (1983). *Ex Parte Frederick C. Holtz, Jr.*, Appeal No. 551–61 (PTO Board of Appeals, April 25, 1984).

The only issue with respect to *Steven* claim 4 is its validity, because all other issues, including infringement, have been admitted by defendants.[1]

For the reasons set forth below, the court concludes that both patents are valid and have been infringed by defendants.[1A]

## I.

### Holtz Patent

Claim 30 of the *Holtz* patent states:

A consolidated integral alloy body which is substantially fully dense formed of a hot worked supersaturated solid solution of an inherently alloying composition said alloy body consisting essentially of a continuous metallurgical phase with a uniformly disbursed hard phase of minute dispersed hard phase particle sizes that are substantially entirely less than three microns in maximum dimension said alloying composition consisting essentially by weight from about .5% to about 5% carbon at least 10% of a hard phased forming element selected from the group consisting of Cr, W, Mo, Ti, Ta, Cb, Zr, Hf, V, and Al, and mixtures thereof, and the remainder base metal and incidental impurities, wherein said base metal is selected from the group consisting of cobalt, iron and nickel, and wherein the total amount of base metal is at least 30%.

Plaintiff contends that Mr. Holtz by virtue of this claim had invented a revolutionary process of producing cutting tool steel in that through this process he was able to achieve an alloy which had full density and fine carbide size, the combination of which substantially improved the overall toughness, hardness, fabricability, grindability and wear resistance of high-speed cutting tools made from that alloy.

The defendants attack the *Holtz* invention on several grounds. First, the defendants claim that the *Holtz* invention is unpatentable for the reason that it was anticipated by an article entitled "Progress Report on Hot Forging Pre-Alloyed Metal Powders" published in 1952 in the publication *Precision Metal Molding*, Vol. 10, Nov. 10, 1952, by Lawrence Mott ("Mott") and by the *Reen I* invention, U.S. Patent No. 3,150,444, issued September 29, 1964. Second, that the claim description in claim 30 is invalid under 35 U.S.C. § 112 (1982) and cannot be restrictively interpreted to be limited to cutting tools. Third, the defendants contend that the *Holtz* patent was obvious in light of the prior art and, therefore, invalid under 35 U.S.C. § 103 (1982). Finally, the defendants contend that the *Holtz* invention is invalid because it constitutes double patenting. With respect to infringement, defendants have stipulated, with two exceptions, to infringement of the elements of *Holtz* claim 30 by their ASP-

---

**1.** Plaintiff's Exhibit 72; Agreed Conclusion of Law 13; Agreed Finding of Fact 109.

**1A.** This opinion constitutes the court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a).

steel products, contesting only that their products are formed by hot working and from a supersaturated solid solution.[2]

## A.

### Validity

### Presumption of Validity

■ Under 35 U.S.C. § 282 (1982), a patent is afforded a presumption of validity. *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 70 (3d Cir.), *cert. denied* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972), *cert. denied* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980); *L.D. Schreiber Cheese Company v. Clearfield Cheese Company*, 540 F.Supp. 1128, 1134 (W.D.Pa. 1982), *aff'd* 716 F.2d 891 (3d Cir.1983). One who challenges validity has the burden of proving invalidity by a standard of clear and convincing proof. *Id.; Northern Engineering and Plastics Corp. v. Eddy*, 652 F.2d 333 (3d Cir.1981), *cert. denied* 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982); *Universal Athletic Sales Co. v. American Gym, Recreational and Athletic Co.*, 546 F.2d 530 (3d Cir.1976), *cert. denied* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977).

The plaintiff here contends that the statutory presumption of validity is strengthened where the Patent Office specifically has considered the prior art relied upon by the party challenging the patentability in a court action, *Universal*, 546 F.2d at 540 n. 28; where it cannot be demonstrated that any uncited prior art was more pertinent than that cited by the patent examiner, *General Battery Corp. v. Gould, Inc.*, 545 F.Supp. 731, 740 (D.Del.1982); *see also Otto v. Koppers Company*, 246 F.2d 789 (4th Cir.1957), *cert. denied* 355 U.S. 939, 78 S.Ct. 427, 2 L.Ed.2d 420 (1958); where the party who challenges validity participated fully in an *inter partes* proceeding before the PTO and raised virtually the same contentions and prior art before the PTO that the party asserts in the court proceedings; and where the patent claims have been reviewed and affirmed by the PTO Board of Appeals. *CMI Corp. v. Metropolitan Enterprises, Inc.*, 534 F.2d 874, 880 (10th Cir.1976).

■ However, as defendants correctly note, the statutory presumption of validity attaching to an issued patent may be weakened where it can be shown to the court that relevant prior art was not examined by the PTO. *Allegheny Drop Forge Company v. Portec, Inc.*, 541 F.2d 383, 384 n. 3 (3d Cir.1976); *Black & Decker Manufacturing Company v. Disston, Inc.*, 436 F.Supp. 1175, 1179 (W.D.Pa.1977); *Schreiber Cheese*, 540 F.Supp. at 1134. This weakening of the statutory presumption of validity may be ameliorated where the prior art which was omitted is not as relevant or pertinent as that which was examined by the PTO and where it is clear that the PTO was aware of the alleged omission of the prior art. *See generally Aluminum Co. of America v. Amerola Products Corp.*, 552 F.2d 1020, 1024–5 (3d Cir.1977).

The proceedings in the PTO pertaining to this case were long and tortuous. The *Holtz* patent application was filed on February 26, 1965, and was issued on July 17, 1973. During the course of this litigation, plaintiff alerted defendants to a pending patent application for a continuation on the *Holtz* invention (the *Holtz* grandchild application) and invited defendants to participate in an *inter partes* PTO proceeding to contest the issuance of the continuation patent. The defendants filed a protest against the continuation grandchild application on December 1, 1976, and since that time have participated fully and completely in PTO protest proceedings.[3]

The *Holtz* grandchild patent application was originally rejected by a patent examiner. On August 6, 1981, a panel of the PTO Board of Appeals reversed that ruling and ruled that the patent application was valid and that the patent should be issued. Subsequently, a second patent examiner ruled that the patent was invalid on the basis of

**2.** Agreed Finding of Fact 51.

**3.** Agreed Finding of Fact 9.

the failure of the inventor-applicant for the *Holtz* Patent to cite prior art, specifically the *Comstock* reference, British Patent No. 781,083, complete specification published August 14, 1957. On October 7, 1982, this decision was made a final rejection of the *Holtz* grandchild application. That decision was appealed to the PTO Board of Appeals, which, as we indicated earlier, reversed the rejection on April 25, 1984.

■ While we apply the statutory presumption of validity under 35 U.S.C. § 282, the question remains whether that presumption must be weakened in light of the fact that the plaintiff concedes that the *Comstock* reference was not cited to the PTO in the original *Holtz* application.[4] The extent to which the presumption may be weakened depends upon comparison of the *Comstock* reference to the art actually cited by the Patent Office. *Aluminum Co. of America*, 552 F.2d at 1025.

### Comstock v. The Prior Art Disclosed at the Patent Office

The plaintiff contends that the prior art before the PTO, i.e., Mott and *Reen I*, were more pertinent to the *Holtz* application than the *Comstock* reference, which plaintiff contends would have been cumulative and not material.

*Comstock* disclosed a process for cutting tool alloys made by powder metallurgy through a process which required: atomization of a powder; cold-compacting that powder; heating the powder into cold-compacting condition; and, then working that product to achieve densification.[5] In comparison, *Reen I* disclosed a process which produced a water-atomized powder from a pre-alloyed powder, which was subjected to a hydrogen atmosphere in an attempt to remove the oxide which resulted from the water atomizing process, followed by a cold compacting process, then a sintering process at a high temperature, and finally a series of cold working and sintering steps to achieve a final product for use in cutting tools.[6] The Mott reference[7] deals with high-temperature *structural* alloys, in particular X40 cobalt.[8] Mott lists four basic steps, which amount to a forging and hot-coining process with the stated purpose of achieving a completely dense material from an initial structure of complete porosity.

It is defendants' position that the *Comstock* reference is indisputably anticipatory of *Holtz* claim 7 and, therefore, material to the *Holtz* invention as a whole.[9] However, the court notes that claims 7, 21, and 22 of the *Holtz* patent are virtually identical to claims 7, 21, and 22 of the *Reen II* reference, U.S. Patent No. 3,244,506, and, therefore, more closely related to *Reen I* than to *Comstock*.[10] For this reason and for the reason that there was substantial prior art before the PTO, the court concludes in light of the *Aluminum Co. of America* standard that the failure to cite the *Comstock* reference does not materially weaken the statutory presumption of validity attaching to the *Holtz* patent.[11] In addition, the April 25, 1984, decision of the PTO Board of Appeals in *Ex Parte Frederick C. Holtz, Jr., supra*, fully supports the foregoing analysis and conclusion.

4. Defendants' Exhibit GGG(2); See generally plaintiff's post-trial brief at 84–98.

5. Plaintiff's Exhibit 29; Tr. at 217.

6. Plaintiff's Exhibit 62; Tr. at 228.

7. Plaintiff's Exhibit 62.

8. Tr. at 1585.

9. Defendants' post-trial brief at 49.

10. *Holtz* claims 7, 21, and 22 originated in *Reen II* and were copied by *Holtz* to provoke an interference, which *Holtz* won. Plaintiff's Exhibit 4 at 48, 50, 133, 145–46, 156–57, 162. Crucible's Post-trial brief at 87. See also *Ex Parte Frederick C. Holtz, Jr., supra*, at 18, where the Board states:

It is significant to note that claims 7, 21, and 22 were copied from U.S. Patent No. 3,244,506, which issued as a continuation-in-part application of Reen after a terminal disclaimer had been filed with respect to Reen. This supports Appellant's position that he always considered Reen more pertinent than Comstock.

11. See generally Plaintiff's Exhibit 4; Plaintiff's Exhibit 13; plaintiff's post-trial brief at 87–8.

*Anticipation*

One element necessary to sustain patent validity is novelty. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120 (3d Cir.), *cert. denied* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). This requirement has been codified in 35 U.S.C. § 102 (1982) and is closely related to the nonobvious requirement of 35 U.S.C. § 103. The standard for lack of novelty, for "anticipation," is one of strict identity. To anticipate a claim for a patent, a single prior source must contain all of the essential elements of that claim. 1 D. Chisum, *Patents* § 3.02 (1978). The classic test of anticipation is set forth in *Knapp v. Morss*, 150 U.S. 221, 14 S.Ct. 81, 37 L.Ed. 1059 (1893), and it provides "that which infringes, if later, would anticipate if earlier." *Id.*, at 228, 14 S.Ct. at 84, (quoting *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537, 9 S.Ct. 389, 392, 32 L.Ed. 738 (1889)).

In addition to the novelty requirement, § 102 provides certain statutory bar or loss of right provisions. Of specific relevance in this case is § 102(b), which the defendants cite as invalidating the *Holtz* patent at suit.

§ 102 provides in its pertinent part:

A person shall be entitled to a patent unless—

.    .    .    .    .

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States ....

The defendants make several contentions with respect to statutory bar and anticipation. First, the defendants contend that the Mott article "Progress Report on Hot Forging Pre-Alloyed Metal Powders," *supra*, provides a basis for the invalidation of the *Holtz* patent. Defendants contend that § 102(b) applies not only to prior publication of the invention in suit, but also to the prior publication of an invention with substantial identity to the patent in suit. *Application of Schaumann*, 572 F.2d 312, 317 (CCPA 1978); *Amphenol Corp. v. General Time Corp.*, 397 F.2d 431 (7th Cir. 1968).

Defendants also claim the *Holtz* patent was anticipated by the *Reen I* reference. 35 U.S.C. § 102 provides in this regard that:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent.

As noted earlier in order to establish anticipation, defendants must show that *Reen I* contains all of the elements of *Holtz*.

The principal difference between *Reen* and the *Holtz* patent cited by the PTO Board of Appeals is that *Reen* pertains to a method of obtaining consolidated heat hardenable steels that is not necessarily restricted to cutting tools steels.[12] In contrast, *Holtz* sought to achieve the desired toughness for cutting tools and was primarily concerned with attaining the combination of full density and a carbide size of 3 microns, facts which the plaintiff cites as evidence that the *Holtz* invention was limited to cutting tool steel.[13]

To rebut this argument, defendants point to several alleged common factors in the *Reen* and the *Holtz* processes. Defendants claim that the *Reen* process could be formed by hot working; that the chemical composition of the *Reen* material falls within the range of claim 30 of the *Holtz* application; that while *Reen* does not use a supersaturated solution, plaintiff attaches no importance to that element in *Holtz* claim 30; and, finally, that both *Reen* and *Holtz* were concerned with substantial or almost full density in addition to fine and disbursed carbides.

**12.** Plaintiff's Exhibit 9 at 11.

**13.** *Id.* at 8.

Mr. Thomas Neumeyer, one of plaintiff's experts, opined that *Reen* was unable to achieve full density without sacrificing fine carbide size.[14] Neumeyer also testified that while in his opinion the *Reen* process could be used to produce cutting tools,[15] it would produce an inferior cutting tool due to the chemical inhomogeneity inherent in the *Reen* process resulting in a lack of full density.[16]

Further, Dr. Hellman, an employee and chief technical expert of defendants, testified that a particular carbide size, 3 microns, was critical to the production of acceptable tool steel.[17] As noted by the PTO Board of Appeals, while *Reen* suggested full density and uniform distribution of carbides, there is nothing in *Reen* which indicates the actual size of the carbides.[18]

For these reasons, and in light of the strict requirements of the test for anticipation, the court finds that *Holtz* was not anticipated by *Reen*.

### Specification

Defendants maintained at trial and indeed, argued that it was one of the critical issues in the case, that the *Holtz* patent claim by its language could not be restricted to cutting tool steel. In support of their position, defendants offered several arguments to show an intent by *Holtz* not to restrict claim 30 to cutting tool steel. The point of this contention is that the patent, having not been restricted to cutting tool steel, was anticipated by *Reen* (see the above section), and/or that the patent is infirm under 35 U.S.C. § 112 [19] which re-

quires that a patent claim be sufficiently descriptive to alert all those in the industry as to what constitutes infringement.

In response, plaintiff offered the testimony of Mr. Neumeyer and Dr. Tien. During his direct examination Mr. Neumeyer listed the essential elements of a metal based cutting tool. He stated that the two essential elements are the metal base or matrix and the alloyed carbides for the so-called hard phase.[20]

Dr. Tien testified that the requirements for high temperature structural alloys and metal base cutting tools differed and that the principal difference was the ultimate tensile strength as tested through bend tests.[21] Dr. Tien further stated that the *Holtz* patent did not describe high temperature structural alloys and he set forth the bases which led him to conclude that the *Holtz* process described tool steel properties with special attention to hardness as opposed to high temperature structural alloys.[22] With regard to tool steel density, Dr. Tien contrasted the *Holtz* invention with the type of steel in a high temperature structural alloy which would be used, for example, in jet engines. He stated that porosity; i.e., lack of density, creates problems with metal fatigue and that in his opinion tool steels were more demanding than structural alloys. According to Dr. Tien, the combination of substantial full density with a uniformly dispersed hard phase described in the *Holtz* patent clearly indicates that Mr. Holtz contemplated a patent for the production of metal based

14. Tr. at 280.

15. Tr. at 260–261.

16. Tr. at 261.

17. Plaintiff's Exhibit 120; Tr. at 1010; Plaintiff's Exhibit 9 at 10.

18. Plaintiff's Exhibit 9 at 12.

19. 35 U.S.C. § 112 provides in part:
    The specification shall contain a written description of the invention, and of the manner and process of making and using it, in

such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.
    The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

20. Tr. at 85–6.

21. Tr. at 1567.

22. Tr. at 1574.

cutting tools rather than structural alloys, and the court so finds.

In addition, the plaintiff offered the testimony of Mr. Holtz who, as inventor, stated that his invention was clearly limited to cutting tools,[23] a fact proven by the stated purpose of the U.S. Air Force contract commissioning the research by him which resulted in the invention in suit.[24] Finally, plaintiff points out that as a matter of law a patent claim must be interpreted in such a way as to protect its validity, citing *Smith v. Snow*, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935).

On balance, after a review of all of the evidence, the court is convinced that claim 30 indeed is limited to cutting tool steel and is sufficient under 35 U.S.C. § 112. This conclusion is based upon an interpretation of claim 30 in light of the patent specifications, the file wrapper and the prior art as well as the testimony of Mr. Neumeyer, Dr. Tien, and Mr. Holtz.[25] We note especially the fact that those learned in the prior art for a long time had been attempting to achieve the necessary uniform distribution of fine carbides in a fully dense material.[26] Also, the *Holtz* research commissioned by the Air Force was for the development of this desired superior tool steel[27] and the testing done on the *Holtz* product; i.e., cutting and transverse rupture tests, evidence this limitation.[28]

### Obviousness

Under 35 U.S.C. § 103, a patent may be invalid if it is a patent on an "obvious invention". Section 103 provides:

§ 103. Conditions for patentability; non-obvious subject matter.

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains....

In *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Court set forth the standard to be used in determining obviousness under § 103:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Id.* at 11, 86 S.Ct. at 690; *Rengo Co. Ltd. v. Molins Machine Company*, 657 F.2d 535, 542 (3d Cir.), *cert. denied* 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 591 (1981). Against this standard, we examine the evidence presented in the trial of this case with reference to the *Holtz* patent.

### Prior Art

■ In determining the question of obviousness, the court is bound to consider all prior art. *New York Scaffolding Co. v. Liebel-Binney Construction Co.*, 254 U.S. 24, 41 S.Ct. 18, 65 L.Ed. 112 (1920). Prior art includes the knowledge, acts, descriptions and patents set forth under 35 U.S.C. § 102. *Mooney v. Brunswick Corp.* 489 F.Supp. 544 (E.D.Wisc.1980), *aff'd* 663 F.2d 724 (7th Cir.1981). Pertinent prior art has

---

23. See Tr. 1294–1498.

24. Tr. at 1308.

25. See Tr. at 1427.

26. In reaching this conclusion, we accept plaintiff's proposed finding 17 and necessarily reject defendants' proposed counterfinding 17.

27. Tr. at 1307–8; Plaintiff's Exhibit 68.

28. Tr. at 1361; Plaintiff's Exhibit 69.

been defined as that which one of ordinary skill in the art reasonably would be expected to look to for a solution to the problems which the patented article solves. *See Tokyo Shibaura Electric Ltd. v. Zenith Radio Corp.*, 404 F.Supp. 547, 556 (D.C.Del. 1975), *aff'd* 548 F.2d 88 (3d Cir.1977).

The court is persuaded that at the time of the *Holtz* invention and indeed, today, it is recognized that in order for high speed tool steels to have the optimum measure of toughness, grindability, heat resistance, hardness, dimensional stability, and wear resistance, they must possess characteristics which too often are mutually exclusive. These include full, or, substantially full, density with a resultant lack of porosity, and a uniformly dispersed hard phase of fine carbides.[29] It is also generally conceded that the attainment of these qualities is very difficult because they are produced by opposite effects.[30]

We have considered all of the prior art references cited by the defendants with special attention to those primary sources; i.e., Mott, *Comstock* and *Reen I*, and have concluded that no prior inventor was able to achieve the requisite combination of high density and finely dispersed carbides necessary to the production of top quality high speed tool steel. Indeed, no prior inventor even regarded such a combination as theoretically possible.[31]

Mr. Neumeyer stated that the *Comstock* process was insufficient to achieve full density.[32] In addition, Neumeyer opined that *Comstock* could not achieve fine carbides due to the use of "as high a temperature as possible" during the compaction process.[33]

Similarly, with respect to *Reen*, Neumeyer stated that *Reen* was unable to achieve full density without sacrificing fine carbide size.[34] As previously noted, Neumeyer suggested that *Reen* could produce cutting tools, but of inferior quality due to the chemical inhomogeneity of the *Reen* product.[35]

With respect to Mott, Dr. Tien noted that Mott dealt with high temperature structural alloys.[36] In addition, Tien concluded that the Mott teaching clearly produced insufficient density for cutting tools and indeed, a density which was below even that recommended for the less demanding high temperature structural alloys.[37]

From our review of these references,[38] we conclude that until the *Holtz* invention, those in the art were left with a choice between the full density achieved through a high temperature process which inevitably yielded undesirable coarse carbides, or a process which controlled carbide growth but which resulted in insufficient density. The *Holtz* process produced the desired combination of full density and fine carbide size necessary to the production of superior cutting tool steel.

■ In reaching this conclusion, we necessarily reject defendants' contention that the 3 micron carbide size is not critical and thus not of "patentable significance." (Defendants' Brief After Trial p. 15). The PTO Board of Appeals stated that "the claimed limitation of three microns as the size of the carbides is significant in terms of the utility of high speed tool steels and

---

29. Agreed Finding 20.

30. Tr. at 142–3.

31. Plaintiff's Exhibit 9 at p. 22 ("neither *Reen* nor *Comstock* even cautions against carbide growth at elevated temperatures").

32. Tr. at 226–7.

33. Tr. at 228.

34. Tr. at 280.

35. Tr. at 261.

36. Tr. at 1585.

37. Tr. at 1591–2.

38. Defendants also cite the *Williams, Hirsch, Federal Mogul* and *Holtz I* references to establish obviousness. See defendants' post-trial brief at 22. However, defendants have not pressed their contention with respect to these references but merely state in conclusory fashion that they also establish that *Holtz* claim 30 is obvious. Nonetheless, the court has reviewed all prior art cited by defendants in reaching the conclusion that the *Holtz* patent in suit is not obvious.

is not merely an arbitrary quantification."[39] This conclusion, with which we agree, finds support in the testimony of Mr. Neumeyer[40] and Dr. Hellman.[41] In any event, the criticality of particular range selection by an inventor is only controlling if criticality is essential to nonobviousness. *See Application of Kroekel,* 504 F.2d 1143 (CCPA 1974). And since we have found that those in the art were unable to achieve the *combination* of fine carbides and full density, the criticality of 3 micron carbides is not essential with respect to obviousness.

We also summarily reject as unsupported by the weight of the evidence, Dr. Lawley's conclusion that *Holtz* claim 30 is obvious.[42]

### Other Considerations

We proceed next to the "other considerations" outlined by the court in *Graham, supra,* because our consideration of the prior art encompassed an examination of the differences between the *Holtz* patent, the prior art in suit and the level of skill in the art.

### Commercial Success

With respect to the commercial success of the *Holtz* invention, the parties have stipulated to the fact that the substantially improved properties of the *Holtz* products have led to substantial commercial success of the products of both plaintiff and defendants.[43]

### Long-Felt Unsolved Needs/Failure of Others

As evident from the foregoing discussion, we have concluded that those in the art of producing cutting tool steel had long desired to improve their products but were unable to achieve the desired combination of necessary qualities. It was precisely for this reason that the U.S. Air Force commissioned the *Holtz* research effort.[44]

It also is clear to the court from the testimony of Dr. Hellman that, at the very least, when defendants became aware of Mr. Holtz' success through his work on the so-called "IITRI" Research Project, defendants commenced work to attempt to achieve the combination of finely dispersed carbides and theoretical full density, and, moreover, recognized that they were substantially behind their American competitor.[45] Additionally, a factor which bears on both commercial success, and long-felt unsolved needs and the failure of others, is the fact that in 1970 Mr. Holtz won an award from *Industrial Research Magazine* for inventing one of the one hundred most significant scientific developments of the year.[46]

In conclusion with respect to obviousness, the court finds that the *Holtz* invention was exactly what it purported to be; viz, the development of a new and previously thought unachievable, yet very desirable, method and process for obtaining the necessary and theretofore mutually exclusive properties of theoretical full density and finely dispersed carbides for use in high speed tool steels.

### Double Patenting

On the eve of trial, defendants for the first time raised the issue that the *Holtz* patent was invalid for double patenting. Counsel for defendants argued that no prejudice would result from this timing because the issue could be resolved as a matter of law by a comparison of the claims of two previously issued *Holtz* patents with the wording of claim 30.[47]

---

39. Plaintiff's Exhibit 9 at 10.

40. Tr. at 478.

41. Tr. at 1010, see also Plaintiff's Exhibit 120.

42. Tr. at 2586.

43. Agreed Finding 25; Tr. at 1520–21.

44. Tr. at 1308.

45. Tr. at 1114.

46. Agreed Finding 39.

47. Tr. at 8–10.

As the court noted during trial, there are two types of double patenting. The first is the same-invention double patenting and the test for this is whether the claim of the subsequent patent literally "infringes" the prior patent. *See* 3 D. Chisum, *supra*, at § 9.03[1][3]. The second type of double patenting is the so-called "obviousness" double patenting, the test for which is very similar to the one employed to determine the nonobviousness requirement for patent validity. *Id.* Obviousness double patenting can be cured by the issuance of a terminal disclaimer under 35 U.S.C. § 253 (1982) which permits a patentee or applicant to disclaim the entire or any part of the term of the patent granted. *See generally Application of Vogel*, 422 F.2d 438, 57 CCPA 920 (1970).

In light of the representations of counsel for defendants, the only issue before the court is the issue of whether or not there is same-invention double patenting. Since that determination does not involve a factual inquiry into the prior art, we look simply to the claims of the prior *Holtz* patents and the claim 30 in suit to determine whether or not they are identical and thus, whether double patenting exists. In *Application of Vogel*, the court stated:

> By "same invention" we mean identical subject matter. Thus, the invention defined by a claim reciting "halogen" is not the *same* as that defined by a claim reciting "chlorine," because the former is broader than the latter. On the other hand, claims may be differently worded and still define the same invention. Thus a claim reciting a length of "thirty-six inches" defines the same invention as a claim reciting a length of "three feet," if all other limitations are identical ... A good test, and probably the only objective test, for "same invention," is whether one of the claims could be literally infringed without literally infringing the other. If it could be, the claims do not define identically the same invention.

422 F.2d at 441 (emphasis in original).

As plaintiff correctly points out, in *Application of Vogel*, the issued patent claims were limited to pork while the claims on application pertained to meat, on which basis the court found no double patenting. In this case, the claims of the prior *Holtz* patents are limited to nickel based alloys, while claim 30 in suit pertains to iron and cobalt alloys in addition to nickel base alloys. On this basis upon the authority of *Application of Vogel*, the court concludes that there is no double patenting.

### B.

### Infringement

In *Graver Tank & Manufacturing Company v. Linde Air Products Company*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950), the Court stated:

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

In the instant action, defendants have admitted the literal infringement of claim 30 with respect to all of its elements except with respect to "hot working" and "supersaturated solid solution".

### Supersaturated Solid Solution

Defendants contend that "[t]he hallmark of a 'solid solution' is the absence of a discernible second phase." And, further, that since "[t]he ASP powder particles used to form defendants' accused products do not consist of a single metallurgical phase; they consist of at least two intimately comingled metallurgical phases; viz., austenite and carbide.... Defendants' accused products are not, therefore, 'formed of a hot worked supersaturated solid solution,' and for that reason do not infringe." [48]

Plaintiff's response is that it is indisputable that the *Holtz* patent, which has powder particles having discernible carbides, is equivalent to defendants' ASP product,

---

**48.** Defendants' post-trial brief at 34–35.

which has its austenite phase in the powder—the defendants' so-called second phase.

The court finds that the defendants' contention that a supersaturated solid solution is limited to a single phase to be a semantic distinction without a difference. To postulate that the creation of austenite particles creates a multiple phase powder reads a limitation into *Holtz* claim 30 with regard to defendants' possible infringement, but ignores the fact that within the *Holtz* powder the dispersed phase of carbides is also theoretically unsaturated and thus, at the very least, the two products are equivalent under the standards set forth in *Graver Tank*.

### Re: HIPing

■ The defendants' contend that HIPing, otherwise known as "hot isostatic pressing," is not "hot working" under the reverse doctrine of equivalents. Under this doctrine, patent law equivalency does not exist if the alleged infringing device produces a different result or the same result in a different way. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568–69, 18 S.Ct. 707, 722–23, 42 L.Ed. 1136 (1898).

Defendants cite a list of differences between HIPing and hot working.[49] However, this argument strains credibility in light of the overwhelming evidence that hot working and HIPing both involve the application of comprehensive forces to the powder metallurgy at elevated temperatures, thus, forging the product into a fully dense material. Plaintiff cites *International Nickel Co. v. United States*, 175 U.S.P.Q. 209 (CCPA 1972) which held at p. 215:

> However, the heat treatment regime used is embraced by the patent claims; and the fact that it may vary somewhat from the regime taught in Bieber's specification does not avoid infringement.

Because we find that through hot isostatic pressing, HIPing, the defendants achieve the same result as *Holtz* in "substantially the same way," *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929), we conclude that defendants have infringed under the doctrine of equivalents. *See also Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856.

■ In conclusion with respect to infringement, the court finds that defendants' ASP 23, 30 and 60 powder metallurgical products are formed of a hot worked supersaturated solid solution and, thus, infringement of *Holtz* claim 30 is complete.

### II.

#### Steven Patent

#### A.

#### Validity

Claim 4 of the *Steven* patent, the claim at issue here, provides:

4. An article of manufacture as defined in claim 2, in the form of a hob for use in milling applications.

[2. An article as defined in claim 1 wherein the composition of said metal body consists of, in percent, 0.80 to 3.00 carbon, up to 2 manganese, up to 1 silicon, up to 0.5 sulfur, up to 18.0 tungsten, up to 10.0 chromium, up to 12 molybdenum, up to 5 vanadium, up to 12 cobalt and balance iron, with tungsten + molybdenum + chromium + vanadium being equal to at least 10 percent.]

[1. As an article of manufacture, a metal body constructed of compacted particles of a high speed tool or die steel composition containing a metal component capable of reacting with carbon to form carbides, said reactive metal component being at least one metal selected from the group consisting of titanium, vanadium, molybdenum, zirconium, columbium, tungsten and tantalum each of said particles having carbides of said reactive metal substantially evenly dispersed throughout, said body having a hardness of at least about 58 R$_c$ and being characterized by size change uni-

---

**49.** Defendants' post-trial brief at 40.

formity upon austenitizing, quenching and tempering.]

The defendants challenge *Steven* on the grounds that it was anticipated and that it is obvious. All other issues of validity and infringement are admitted.[50] In addition, defendants contend that the statutory presumption of validity which normally would attach to the *Steven* patent is nullified by plaintiff's failure to cite relevant prior art[51] to the patent examiner.[52]

## B.

### Anticipation

As noted *supra,* the test of anticipation is one of strict identity. For a reference to be anticipatory, it must contain all of the elements of the claimed invention. 1 D. Chisum, *supra,* at § 3.02; *Skelly Oil Co. v. Universal Oil Products Co.,* 31 F.2d 427, 431 (3d Cir.1929). Anticipation cannot be shown by combining more than one reference to show the elements of the claimed invention. 1 D. Chisum, *supra,* at § 3.02; *Application of Saunders,* 444 F.2d 599, 602, 58 CCPA 1316 (1971). As was noted in *Cold Metal Process Co. v. Carnegie-Illinois Steel Corporation,* 108 F.2d 322, 333 (3d Cir.1939), *cert. denied* 309 U.S. 665, 60 S.Ct. 590, 84 L.Ed. 1012 (1940), quoting from an earlier opinion of the Third Circuit in *Skelly Oil Co. v. Universal Oil Products Co.,* 31 F.2d 427, 431 (3d Cir.1929):

> A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. *Otto v. Linford,* 46 L.T. (N.S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. *Flour Oxidizing Co. v. Carr & Co.,* 35 R.P.C. 457. A singularly sensible

test of the rule of anticipation is given in *British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co.,* 45 R.P.C. 22, by asking the question— "Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: 'That gives me what I wish?'" . . . .

In this context, defendants allege that *Steven* is anticipated by *Comstock* and *Holtz.*

### Steven v. Comstock

The *Steven* patent provides a process for making hobs, a type of high speed tool, through a powder metallurgical process. The *Steven* process provides for a hardening treatment stage involving metallurgical phase changes, including austenitizing, quenching, and then, tempering, all designed to achieve size change uniformity and a resultant elimination of out-of-roundness and dimensional instability.[53]

Defendants contend that *Comstock's* uniform carbide distribution and substantial non-porosity make it anticipatory of *Steven.* In support of this position, the testimony of Dr. Lawley was offered. Dr. Lawley testified that the problem recognized by *Steven;* viz., that out-of-roundness after hardening treatment is a function of carbide alignment, previously was answered by *Comstock.*[54]

Plaintiff contends that while *Comstock* mentions tool use in milling cutter applications, it failed to achieve full density or size change uniformity. Plaintiff offered Mr. Neumeyer who testified that Comstock's use of a hot coining process in a fixed wall die produced density gradients and surface

---

**50.** Agreed Finding 52; Agreed Conclusion 13; Agreed Finding 109; see generally plaintiff's post-trial brief at 23.

**51.** *Comstock.*

**52.** *Steven* file history, Plaintiff's Exhibit 7.

**53.** See generally Plaintiff's Exhibit 5; plaintiff's post-trial brief at 15; defendants' post-trial brief at 40.

**54.** Tr. at 2575.

friction causing uneven densification.[55] Neumeyer contended that full density was necessary for hobs,[56] and it is plaintiff's position that this was achieved by *Steven* and by no other.

In addition, plaintiff contends that *Comstock* is inhomogenous. Neumeyer stated that because of the reliance by *Comstock* on high temperatures, the existence of course carbides was inevitable.[57] This, plaintiff contends, leads to an inability by *Comstock* to achieve size change uniformity, the necessary predicate to avoiding out-of-roundness.

The plaintiff's position is supported by the decision of the PTO Board of Appeals[58] wherein the Board in passing on the *Holtz* grandchild application, assessed the *Comstock* reference to be devoid of any caution or concern with regard to the growth of coarse carbides at high temperatures. Given this evaluation with which the court agrees, and the standard for anticipation under 35 U.S.C. § 102, the court finds that the *Steven* patent is not anticipated by *Comstock.*

### Steven v. Holtz

The court also finds that the defendants' argument that *Holtz* anticipated *Steven* is untenable. The parties agree that the PTO refused to conduct an interference proceeding between the *Holtz* and *Steven* patents,[59] however, each side attributes different significance to that fact. Plaintiff contends that although Mr. Holtz achieved size change uniformity, his patent did not disclose that property,[60] and since the PTO refused to declare an interference,[61] this is grounds for finding no anticipation.

Defendants contend that the failure of plaintiff to convince the PTO to declare an interference constitutes a finding by the PTO of a lack of the inherency required to justify interference. *See Gubelmann v. Gang,* 408 F.2d 758, 766, 56 CCPA 1013 (1969). Thus, defendants contend that the failure of the plaintiff to gain an interference does not control, since "[t]he important thing is that ... plaintiff admits inherency in this case."[62]

Defendants are correct in that regard. However, we find that while size change uniformity was inherent in *Holtz,* it nevertheless cannot be said that *Holtz* anticipated *Steven,* since the existence of this inherency alone of merely one element of the claimed invention, does not fulfill the strict requirements of anticipation. *See Cold Metal Process Co. v. Carnegie-Illinois Steel Corporation,* 108 F.2d at 333.

### C.

#### Obviousness

With respect to the *Steven* patent, defendants contend the claim invention is obvious in light of *Holtz, Comstock, Frehser*[63] and *Lement.*[64] We consider this contention in light of the statutory presumption of validity and the *Graham* criteria.

#### Steven v. Holtz re: obviousness

In considering this issue the court notes the irony of the parties' positions. Plaintiff contends that *Holtz* is limited to cutting tools, but maintains that *Steven,* a concededly similar powder metallurgy hob, a cutting tool, is not obvious. Defendants, on the other hand, contend vigorously that *Holtz* is *not* limited to cutting tools, but would have us find that *Steven* is obvious

---

55. Tr. at 227.

56. Tr. at 166.

57. Tr. at 229.

58. Plaintiff's Exhibit 9.

59. Plaintiff's post-trial brief at 16; defendants' reply brief at 43 n. 12.

60. Defendants' post-trial brief at 16.

61. Plaintiff's Exhibit 4.

62. Defendants' post-trial reply brief at 43, n. 12.

63. "Anisotropic Dimensional Changes due to Heat Treatment of Ledeburitic Chrome Tool Steels" (1953); Defendants' Exhibit BB.

64. "Distortion in Tool Steels" (1959); Defendants' Exhibit CC.

in light of *Holtz* because *Steven's* hob-producing (cutting tool producing) process is a specific example of the *Holtz* teachings.

Nonetheless, the court finds that *Steven* is not obvious. The principal benefit of the *Steven* process is in its elimination of the out-of-roundness traditionally characteristic in past methods of producing hobs. This, as we previously noted, is achieved through a hardening treatment phase which maximizes size change uniformity, a property particularly essential for hobs because of the reduction of out-of-roundness and resultant increased dimensional stability. While we find that *Holtz* is limited to cutting tools, the *Steven* process is not obvious.

### Steven v. Comstock re: obviousness

As noted, *supra,* the *Comstock* reference pertained to milling cutters of which a hob is a specific example. However, we have also noted that *Comstock's* hot-coining process utilized high temperatures and resulted in coarse carbides. As the PTO Board of Appeals found, we also find that this reflects *Comstock's* lack of ability to attain full, or substantially full, density *and* uniformly distributed fine carbide particles. *Steven* was able to achieve this, and for this reason we believe that *Steven* is not obvious in light of *Comstock.*

### Steven re: other prior art

Defendants cite the *Lement* and *Frehser* references as establishing the obviousness of *Steven's* claimed achievement of improved dimensional stability through elimination of inhomogeneous carbide segregations.[65] However, as plaintiff correctly points out, the principal thrust of the teachings of both *Lement* and *Frehser* was that distortion was problematic in tool steels,

suggesting that "heat treatment without dimensional changes can be achieved only in exceptional cases,"[66] and "dimensional changes that occur in tool steels are due to phase transformations, plasticity, elasticity and thermal expansion."[67] While both *Lement* and *Frehser* recognized the importance of chemical composition and finishing processes as controls on distortion,[68] neither reference even considers the production of tool steel through a powder metallurgy process. While the *Lement* reference notes the problems of out-of-roundness,[69] no solution is offered, but instead suggestion is made as to what tempering processes may be used to limit this problem.[70] It is evident to the court from these facts, that *Steven* is not obvious in light of *Lement* and *Frehser*.

### Steven re: other considerations [71]

The court finds that the long-felt need for the *Steven* invention is established by the previous consideration of the prior art. It is established that those in the art were unable to achieve a sufficient degree of dimensional stability to cope with the out-of-roundness problem inherent in hobs. Moreover, it appears that those who addressed the problem were in disagreement as to the cause. The *Steven* process is not only nonobvious, but appears to be revolutionary in its elimination of dimensional instability in hobs.

▮▮▮ For the foregoing reasons, the court concludes that the *Steven* patent is valid.

### III.

### Willful Infringement

▮▮▮ Under 35 U.S.C. § 284, the court has discretion to award treble damages for

---

**65.** Defendants' post-trial brief at 43; defendants' reply brief at 44.

**66.** Defendants' Exhibit BB at 2 (of translation); see also plaintiff's post-trial brief at 15, 102.

**67.** Defendants' Exhibit CC at 1.

**68.** Defendants' Exhibit CC at 53–88.

**69.** Defendants' Exhibit CC at 6, 75–76.

**70.** *Id.* at 76.

**71.** The only other prior art reference cited is the *Fletcher* reference cited by plaintiff. As plaintiff's note, *Fletcher* specifically disavowed the relationship between inhomogeneous carbide distribution and dimensional changes. See Plaintiff's Exhibit 255.

willful infringement of plaintiff's patent rights. *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 612 F.2d 1353, 1361 (3d Cir.), *cert. denied* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980), *opinion clarified* 638 F.2d 661 (3d Cir.1981). A patent owner is entitled to treble damages where another has knowingly, deliberately, intentionally, willfully or wantonly infringed the patent. *Smith v. Alyeska Pipeline Service Co.*, 538 F.Supp. 977, 986 (D.Del.1982); *Jenn-Air Corp. v. Penn Ventilation Co.*, 394 F.Supp. 665, 676 (E.D.Pa.1975). However, where the issue of patentability is close and litigated in good faith, the court should be reluctant to impose punitive damages. *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1383 (5th Cir. 1976); *Upjohn Co. v. Italian Drugs Importing Co.*, 190 F.Supp. 361, 367 (S.D.N.Y. 1961).

■ In this action, while plaintiff cites multiple bases for a finding of willfulness, the essence of plaintiff's case on this issue is Dr. Hellman's memorandum dated February 5, 1973.[72] The Hellman memo followed a meeting between officials of plaintiff and defendants during which plaintiff alerted defendants to the existence of patent claims which allegedly were being infringed by sales of defendants' ASP steel in the United States.

Upon review of the Hellman memorandum[73] and consideration of Dr. Hellman's explanation of the memorandum at trial,[74] several facts are apparent to the court.

First, Dr. Hellman's memorandum was based upon the *assumption* that defendants were infringing plaintiff's patent claims, as to which assumption he stated "we have no possibilities for checking on this . . . ." Second, based upon the *assumed* premise that plaintiff's patents were valid and being infringed by defend-

ants, Dr. Hellman charted a strategy to check patent validity; contest patent validity; and, in the process, to get defendants' products into the United States market. Finally, Hellman assessed the costs and prospects of litigation upon the further assumption that "the evaluation give the right result."[75]

On balance, the court is unpersuaded that the evidence including Dr. Hellman's memorandum is sufficient to constitute a basis for treble damages. While the patent laws are designed to protect invention, 4 D. Chisum, *supra*, at § 16.02[1], the availability of damage awards serves that purpose, the treble damage awards should not be used to thwart good faith efforts to contest patent validity. *Yoder, supra*. Here, when defendants first were made aware of plaintiff's patent rights by letter from counsel in 1972, they replied that the patents in question were invalid because of *Comstock* and the 1964 *Holtz* article in *Metalworking Magazine*. After the meeting in 1973, the Hellman memorandum merely evidences an aggressive strategy of contesting the patents. The defendants' claims of good faith have not been overcome by the evidence, and we decline to find this to be such an "exceptional case" under 35 U.S.C. § 284 (1982), to justify the award of treble damages. The issues of patent validity, especially, presented substantial questions upon which there has been genuine debate and honest disagreement as evidenced throughout this litigation and by the protracted and checkered history of this matter in the PTO.

## IV.

### Fraud/Unclean Hands

At trial, counsel for defendants stated that defendants were not alleging fraud to invalidate the *Holtz* and/or *Steven* patents,

---

**72.** Plaintiff's Exhibit 159.

**73.** The Hellman memorandum was admitted over privilege objections at trial; transcript at 1234 with the question of its admissibility in light of Fed.R.Evid. 408 reserved. Transcript at 1227-8. Upon review of this issue post-trial, the court concludes that Rule 408 is not applicable

and the document is admissible. See generally 2 J. Weinstein, *Evidence,* ¶ 408.01 (1982).

**74.** See generally, Tr. at 1194–1265; 1857–2050.

**75.** Plaintiff's Exhibit 159 at line 127.

but merely were attempting to show unclean hands to establish a basis for attorneys' fees in the event defendants prevailed.[76] Since defendants have not prevailed, there is no basis for an award of attorneys' fees to defendants. 35 U.S.C. § 285 (1982).

An appropriate order will follow.