CRUCIBLE, INC., and Crucible
Materials Corporation,
Plaintiffs,

v.

STORA KOPPARBERGS BERGSLAGS
AB, and Uddeholms AB, Defendants.

STORA KOPPARBERG CORPORATION
and Uddeholm Steel Corporation,
Plaintiffs,

v.

CRUCIBLE, INC., Defendant.

CRUCIBLE MATERIALS
CORPORATION,
Plaintiff,

v.

STORA KOPPARBERG BERGSLAGS
AB et al., Defendants.

Civ. A. Nos. 74–917, 74–1062
and 84–2106.

United States District Court,
W.D. Pennsylvania.

Dec. 5, 1988.

H. Woodruff Turner, Neal R. Brendel, Louis E. Wagner, Kirkpatrick & Lockhart, Pittsburgh, Pa., Ford F. Farabow, Jr., Allen M. Sokal, Clair X. Mullen, George E. Quillin, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., Harvey O. Simmons, Crucible Materials Corp., Pittsburgh, Pa., for plaintiffs Crucible.

John M. Webb, Pittsburgh, Pa., Francis J. Hone, New York City, for defendants Stora, et al.

## OPINION

DIAMOND, District Judge.

A determination of claim validity and infringement was previously made by the court in this patent case and affirmed on appeal. Presently before the court is the parties' joint request for reference of the accounting stage of this matter to a special master under Fed.R.Civ.P. 53.[1] Before such a reference can be made, however, certain outstanding issues need to be resolved. Specifically, the outstanding matters include: 1) Crucible's motion for partial summary judgment dismissing the Stora–Uddeholm antitrust counterclaim; 2) the question of increased damages and attorney fees on remand from the Court of Appeals for the Federal Circuit; 3) the appropriate measure of damages and rate of prejudgment interest; and 4) Crucible's motion to join Kloster Speedsteel AB and Speedsteel of New Jersey, Inc. The court will address each matter in turn.

## I. ANTITRUST

The parties adverse to Crucible ("adverse") have accused Crucible of various violations of the antitrust laws. Originally, in the Answer and Counterclaim filed in Civil Action 74–917 on November 28, 1975, the adverse parties asserted that: 1) Crucible illegally restrained trade in powder metallurgy ("PM") products in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by contracting and conspiring with IIT

---

1. This opinion assumes familiarity with all prior decisions of this court and the Court of Appeals for the Federal Circuit including *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987); *Crucible v. Stora*, Nos. 74–917 and 74–1062, slip op. (W.D.Pa. Mar. 12, 1985) [available on WESTLAW, 1985 WL 2872]; *Crucible, Inc. v. Stora Kopparbergs AB*, 594 F.Supp. 1249 (W.D.Pa.1984).

Research Institute ("IITRI") and others; and 2) Crucible illegally monopolized commerce in PM high speed steel products in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by fraudulently and in bad faith obtaining patents 3,561,934 ("*Steven* patent-in-suit") and 3,746,518 ("*Holtz* patent-in-suit") by failing to disclose to the United States Patent Office the best prior art known. However, these bases are no longer at issue. The Section 1 claim and the fraudulent procurement of the *Steven* patent-in-suit claim have been withdrawn by the adverse parties; and the fraudulent procurement of the *Holtz* patent-in-suit was previously rejected by the court[2] and affirmed on appeal.[3]

On February 12, 1979, the adverse parties asserted additional antitrust claims in the form of a statement in the nature of a bill of particulars.[4] Specifically, the adverse parties particularized Count Two of the Answer and Counterclaim by asserting that: 1) Crucible attempted to monopolize trade in PM high speed steel products in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2,[5] by acquiring patents from the Battelle Memorial Institution ("Battelle") by agreement dated March 2, 1966, by acquiring the *Holtz* patent-in-suit and other patents from IITRI by agreement dated December 13, 1971, and by refusing to license others under said patents; and 2) Crucible acquired assets (patents) of other corporations (Battelle and IITRI) also engaged in commerce in PM high speed steel products, the effect of such acquisition was, and continues to be, to lessen competition and to tend to create a monopoly, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.[6] Relying on *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 *reh'g denied*, 456 U.S. 985, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982), Crucible now moves for partial summary judgment under Fed.R.Civ.P. 56 dismissing the remaining antitrust claims.

### Discussion

In the *Xerox* case, SCM, a manufacturer of office photocopy machinery, charged that Xerox's acquisition of certain patents and subsequent refusal to license those patents excluded SCM from competing in the relevant product market dominated by Xerox products in violation of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. 645 F.2d at 1197. In that case, Xerox had acquired the patents from the Battelle Memorial Institute, the same non-profit research organization involved in the present case, and "self described as 'in the business of developing and improving technical inventions and in selling the rights thereon when patented.'" *Id.* at 1198. The Xerox–Battelle relationship culminated in 1956 with an agreement transferring title of the four basic xerography

2. *Crucible v. Stora*, Nos. 74–917 and 74–1062, slip op. at 17–19 (W.D.Pa. Mar. 12, 1985).

3. *Kloster Speedsteel AB v. Crucible, Inc*, 793 F.2d 1565, 1576 (Fed.Cir.1986).

4. Crucible asserts that the bill of particulars is an impermissible means of amending the complaint without court approval and without written consent of Crucible. However, the court believes that the original counterclaim was broad enough to include, and put plaintiff on notice as to, the claims in the bill of particulars.

5. Section 2 of the Sherman Act provides as follows:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

6. Section 7 of the Clayton Act provides in pertinent part:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

patents to Xerox. *Id.* at 1199. Pursuant to these patents, Xerox "enjoyed a complete monopoly in the production of plain-paper copiers between 1960 and 1970," with revenues rising from $47 million in 1960 to $1.7 billion in 1970.

The United States Court of Appeals for the Second Circuit began its analysis by stating that although the patent and trademark laws share the common goal of promoting competition, the methods embraced by both laws often result in conflict. *Id.* at 1203. "While the antitrust laws proscribe unreasonable restraints of competition, the patent laws reward the inventor with a temporary monopoly that insulates him from competitive exploitation of his patented art." *Id.* The court noted that patent acquisitions are not immune from the antitrust laws. *Id.* at 1205. However, striking a balance between the patent and antitrust laws, the court held that "where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws [such as a refusal to license] cannot trigger any liability under the antitrust laws." *Id.* at 1206.

Turning its attention to the case at hand, the court stated that the appropriate inquiry focused upon the circumstances of the acquiring party and the status of the relevant product and geographic markets at the time of the patent acquisitions. *Id.* at 1207. Because Xerox acquired the patents four years prior to the production of the first plain-paper copier and at least eight years prior to the appearance of the relevant product market in plain-paper copiers, the court concluded that, as a matter of law, the patent acquisitions did not violate either the Sherman or Clayton Acts. *Id.* at 1208–1212. The court also believed that the purposes of the antitrust laws would not be furthered by finding an antitrust violation in the transference of a patent from a research organization that was not a market competitor. The court noted that "[t]here appears to be little distinction,

if any, between patents obtained under a contract with a research organization and patents generated internally by a company . . . and ordinarily there is no limitation on a company's freedom to generate its own patents." *Id.* at 1207. (citations omitted).

Crucible argues that the present case is on all fours with *Xerox.* Specifically, Crucible asserts two principal grounds for dismissing the Section 2 and Section 7 claims. First, Crucible argues that because there was no relevant market in PM high speed steel products at the time of the patent acquisitions in 1966 and 1971, there could be no reduction in competition and no monopolization or attempted monopolization. Second, because Battelle and IITRI are research organizations in the business of developing inventions but not capable of commercializing them, the acquisitions of patents from them is akin to internal development of inventions which are not subject to antitrust scrutiny.

A. *Section 2 of the Sherman Act and the Relevant Market.*

 The procedural posture of Crucible's motion, however, creates at least one significant distinction between this case and *Xerox.* In *Xerox,* the district and appellate courts had the benefit of a jury finding that the relevant market in copiers did not exist until eight years after the patent acquisitions. Since there has been no such finding in the present case, the court must now determine whether, based upon the undisputed facts of record,[7] there existed a relevant product market in PM high speed steel products at the time of the patent acquisitions in 1966 (Battelle) and 1971 (IITRI).

In the seminal case of *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (the "Cellophane" case), the United States charged Du Pont, the manufacturer of cellophane, with monopolization of trade in

---

7. In support of its motion, Crucible submitted a statement of undisputed facts supported by an appendix of materials including affidavits and deposition testimony. The adverse parties, rather than controverting those facts and submitting

opposing materials, however, chose to argue the inapplicability of *Xerox* to the present case. Accordingly, the court considers Crucible's statement of facts to be the undisputed facts of record.

that product in violation of Section 2 of the Sherman Act. Du Pont defended by arguing that cellophane did not constitute its own market, but rather was merely a part of the relevant market for flexible packaging materials, over which Du Pont had no market control.

The Supreme Court noted that the determination of what constitutes the relevant market for antitrust purposes varies with each case. 351 U.S. at 395, 76 S.Ct. at 1007. However, the Court offered guidance by stating that:

> In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal.
>
> * * * * * *
>
> In determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control.

*Id.* at 395–396, 76 S.Ct. at 1007–1008. In sum, the "market is composed of products that have reasonable interchangeability for the purposes for which they were produced —price, use, and qualities considered." *Id.* at 404, 76 S.Ct. at 1012; *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

In the *Cellophane* case, the Court found that cellophane's functional interchangeability with other flexible packaging materials[8] was sufficient to make it part of the flexible packaging material market, and not a separate market. *Id.* at 400, 76 S.Ct. at 1009. Noting that there was no proof or allegation that Du Pont ever possessed control over the flexible packaging market (cellophane only accounted for 17.9% of the market), the Court concluded that the charge of monopoly must fail. *Id.* at 399–404, 76 S.Ct. at 1009–1012.

In the present case, the court finds that the undisputed facts of record clearly indicate that PM high speed steel products did not constitute a separate relevant market at the time of the patent acquisitions, but rather were part of the much larger conventional high speed steel market. Regarding the 1966 acquisition of the Battelle patents, a finding of no relevant market in PM high speed steel products is mandated by the fact that commercial production and marketing of PM high speed steel products in the United States did not begin until 1971, four years after the patent acquisitions. Affidavit of Warren T. Bickerton ("Bickerton") at para. 5 (Attachment D at 2–3).[9] "The patent system would be seriously undermined ... were the threat of potential antitrust liability to attach upon the acquisition of a patent at a time prior to the existence of the relevant market and, even more disconcerting, at a time prior to the commercialization of the patented art." *Xerox,* 645 F.2d at 1206.

At the time of the 1971 acquisition of the IITRI patents, however, production and marketing by Crucible of PM high speed steel products had begun. In 1971, Crucible sold approximately 67 tons of PM high speed steel for total sales of $292,000. Bickerton at para. 6 (Attachment D at 3). At this time, however, PM high speed steel products competed only with conventional high speed steel products. Bickerton at para. 7 (Attachment D at 3–4). The adverse parties did not begin to import their infringing ASP high speed steel products into the United States until December of 1974. Stora/Uddeholm's Response to Interrogatory 5(a) of First Set of Post–Trial Interrogatories (Attachment L). Regarding the crucial issue of interchangeability, when Crucible first marketed PM high speed steel products in 1971,

---

8. The other flexible packaging materials included Glassine, Greaseproof and Vegetable Parchment Papers; Waxing Papers; Sulphite Bag and Wrapping Papers; Aluminum Foil; Cellulose Acetate; Pliofilm; Polyethylene; Saran and Cry–O–Rap. 451 U.S. at 405, 76 S.Ct. at 1012.

9. References to attachments refer to the Appendix to Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment Dismissing the Antitrust Claims of Count 2.

[Crucible] sought to persuade purchasers of conventional high speed steel products that such products could be advantageously replaced with PM products. The PM high speed steel products were used to make the same tools, such as broaches, hobs, etc., but offered advantages such as extended tool life due to improved toughness, superior grindability and better concentricity in heat treatment. At this time, Crucible's PM high speed steel products and conventional high speed steel products had only the same uses, were sold to the same customers by the same vendors, had no separate industry recognition, and definitely were in competition with one another.

Bickerton at para. 7 (Attachment D at 4). The finding of sufficient interchangeability between PM high speed steel products and conventional high speed steel products is also supported by the fact that Stora's marketing strategy when it began to sell its infringing ASP products in the United States in 1974 was also to convert users of conventional high speed steel products to ASP high speed steel products. *See, e.g.,* January 22, 1985, Deposition of Delroy G. Heiser at 91, 118–124 (Attachment P).

Based upon the above, the court concludes that the undisputed facts of record sufficiently indicate that at the time of the patent acquisitions in 1971, the relevant market for antitrust purposes was the conventional high speed steel market, not a separate PM high speed steel market. Because there have been no allegations that Crucible has attempted to, or succeeded in monopolizing the conventional high speed steel market, further market analysis is unnecessary.[10]

In summary, the court concludes that because there was no relevant market in PM high speed steel products in 1966 or 1971, the acquisitions of the Battelle patents in 1966 and the IITRI patents in 1971 did not violate Section 2 of the Sherman Act. In addition, because the patents were lawfully acquired, the court concludes that Crucible's refusal to license (conduct permissible under the patent laws) does not

trigger any liability under the antitrust laws. *Xerox,* 645 F.2d at 1206. Accordingly, Crucible's motion for summary judgment dismissing the adverse parties Section 2 claim will be granted.

### B. *Section 7 of the Clayton Act.*

■ Section 7 of the Clayton Act "proscribes a corporation from acquiring the whole or any part of the assets of another corporation where 'the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly [in any line of commerce].'" *Xerox,* 645 F.2d at 1210 (quoting 15 U.S.C. § 18). A patent, as a form of property, is an asset and not exempt from scrutiny under Section 7. *Xerox,* 645 F.2d at 1210. (citations omitted).

In *Xerox,* however, the court held that the lack of relevant product market at the time of the patent acquisition precluded a finding of liability under Section 7 of the Clayton Act as well as under Section 2 of the Sherman Act. *Xerox,* 645 F.2d at 1211. In so concluding, the court also rejected an argument propounded by SCM that the acquisition of the patents became actionable under Section 7 as soon as the monopoly afforded by the patents developed into an economic monopoly:

Where a corporation's acquisition of a patent is not violative of § 7, as was the case here, its subsequent holding of the patent cannot later be deemed violative of this section. Where a company has acquired patents lawfully, it must be entitled to hold them free from the threat of antitrust liability for the seventeen years that the patent laws provide. To hold otherwise would unduly trespass upon the policies that underlie the patent law system. The restraint placed upon competition is temporarily limited by the term of the patents, and must, in deference to the patent system, be tolerated throughout the duration of the patent grants.

*Id.* at 1211–1212.

■ In the present case, the court concludes that the absence of a relevant mar-

---

**10.** The court notes that Crucible's sales of PM high speed steel products in 1971 represented only .3% of the conventional high speed steel market in the United States. At that time, Crucible's market share of the conventional high speed steel market was 9.5%.

ket in PM high speed steel products at the time of patent acquisition precludes the applicability of Section 7. Moreover, the court finds compelling the undisputed fact that the entities from which the patents were acquired (Battelle and IITRI) were not market competitors; nor were they even capable of commercially developing the patents. *See Xerox*, 645 F.2d at 1207. Accordingly, Crucible's motion for summary judgment dismissing the adverse parties Section 7 claim will be granted.

The adverse parties argue that the *Xerox* decision is not controlling in the present case because that decision pertains only to the appropriateness of money damages and left open the question of whether equitable relief, such as prospective licensing or withholding of equitable relief to enjoin infringement, is available. Since the adverse parties now claim to only seek equitable relief, they assert that *Xerox* is not dispositive of their antitrust counterclaim.

Although the court notes that the district court decision in *Xerox* related only to money damages and left open the question of possible equitable relief, *see SCM Corp. v. Xerox Corp.*, 463 F.Supp. 983 (D.Conn. 1978), this court does not read the Second Circuit's affirmance in so limiting a fashion. The Second Circuit clearly found *no* antitrust violation whatsoever:

> [W]e hold that where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger *any* liability under the antitrust laws.

645 F.2d at 1206. (emphasis added). This is further supported by the Second Circuit's summation which indicates that SCM was not entitled to recover damages because there was *no* antitrust violation. Specifically, the court concluded that: "[b]ased on the evidence presented we are convinced that none of Xerox's patent-relat-

ed conduct contributed to *any* antitrust violations and that, therefore, SCM is not entitled to recover any monetary damages in connection with that claim." *Id.* at 1213. (emphasis added).

## II. INCREASED DAMAGES AND ATTORNEY FEES

The issue of increased damages is before the court for the second time. This court had earlier found that increasing damages under 35 U.S.C. § 284 [11] was not warranted under the facts and circumstances of the present case. *Crucible, Inc. v. Stora Kopparbergs Bergslags AB*, 594 F.Supp. 1249, 1264 (W.D.Pa.1984), *aff'd in part and remanded in part sub nom., Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987).

On appeal, the United States Court of Appeals for the Federal Circuit affirmed this court's determination that the patents-in-suit were valid and infringed, but found that the court's refusal to award increased damages, to the extent it was based upon a finding of non-willful infringement, was clearly erroneous and remanded the matter for further proceedings. *Kloster*, 793 F.2d at 1579–80. Recognizing that this court did not have the guidance on the law of willful patent infringement provided by the Federal Circuit subsequent to the time of trial, that court outlined the relationship between a finding of willful infringement and the failure of a potential infringer to obtain legal advice. *Id.* at 1579. The court stated that one who has actual notice of another's patent rights has an affirmative duty "to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity." *Id.* (emphasis in original) (citations omitted). The court noted that not every failure to seek an opinion of competent counsel will mandate a finding of willfulness; and converse-

---

11. 35 U.S.C. § 284 reads as follows:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

ly, the fact that an opinion of counsel was obtained does not automatically dictate a finding of non-willfulness. *Id.* (citations omitted). However, the court concluded that "[i]n the present case, the totality of the circumstances, including the failure to seek advice of counsel, makes any finding of non-willfulness clearly erroneous and compels the only alternative finding, i.e., that Stora's infringement was willful." *Id.* Because a finding of willful infringement in and of itself does not mandate an award of increased damages, however, the Federal Circuit remanded the matter to this court to determine whether increased damages should be awarded, and if so, to determine the appropriate level of the increase. *Id.* at 1580. In addition, because this court did not specifically address the question of attorney fees under 35 U.S.C. § 285, the Federal Circuit remanded that issue as well.

■ The adverse parties argue that because the Federal Circuit did not disturb any of this court's factual determinations, the court should confirm its earlier decision denying increased damages notwithstanding the Federal Circuit's labelling of defendants' actions as willful infringement. On the other hand, Crucible argues for the increased damages which it claims normally accompany a finding of willful infringement. For the reasons set forth below, the court concludes that an award of increased damages is appropriate; however, the level of this increase will be double, not treble damages.

Originally, the court considered the question of increased damages to be a close one, but, on balance, concluded that such damages were not appropriate. *Crucible,* 594 F.Supp. at 1263–1264. Although the adverse parties correctly note that the factors balanced by the court remain undisturbed by the Federal Circuit, such factors take on a different significance in light of that opinion.

For example, the primary factors relied upon by the court were the substantial questions of patent validity and the court's belief that the actions of the adverse parties "merely evidence[d] an aggressive strategy of contesting the patents." *Id.* at 1264. In concluding that the infringement was willful, however, the Federal Circuit indicated that an "aggressive strategy," unsupported by any competent advice of counsel, is "the type of activity the reference in the patent laws to increased damages seeks to prevent." *Kloster,* 793 F.2d at 1580 n. 11.

Based upon this indication as to the significance of such an aggressive strategy, as well as the Federal Circuit's conclusion that the infringement was willful (by concluding that a finding of non-willfulness would be clearly erroneous), this court finds that the balance, which at one point favored not awarding increased damages, now tips in favor of such an award. However, because the court still considers the question to be a close one; and because the court does not believe the defendants acted egregiously, the court concludes that double, and not treble damages are appropriate. *See, e.g., Del Mar Avionics, Inc. v. Quinton Instrument Co.,* 836 F.2d 1320 (Fed.Cir.1987) (district court decision doubling damages based upon willful infringement but refusing to treble them affirmed by Federal Circuit as within district court's discretion).

In addition to increased damages, the patent laws provide for an award of reasonable attorney fees to the prevailing party in exceptional cases.[12] 35 U.S.C. § 285. A finding of willful infringement, as directed by the Federal Circuit in the present case, "is legally sufficient to meet the criterion of 'exceptional case,' and in such case it is within the court's discretionary authority to award attorney fees." *Del Mar,* 836 F.2d at 1329.

The adverse parties assert that an award of attorney fees is not mandated by the Federal Circuit remand and argue that this

---

**12.** It should be noted that the term "exceptional case" appeared in this court's earlier opinion refusing to award increased damages. *See Crucible,* 594 F.Supp. at 1294. However, the use of the term at that time was limited to the question of increased damages, and was not meant to be an indication as to the appropriateness of attorney fees under 35 U.S.C. § 285.

court should rely on its earlier findings, utilized in denying increased damages, to deny an award of attorney fees. Crucible asserts that the case is "exceptional" and argues for an award of attorney fees it claims normally accompany a finding of willful infringement.

In support of its position, Crucible cites *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.* for the proposition that "[d]istrict courts have tended to award attorney fees when willful infringement has been proven, and the [United States Court of Appeals for the Federal Circuit] has uniformly upheld such awards." 781 F.2d 198, 200 (Fed. Cir.1986). However, that court also noted that:

> Even an exceptional case does not require in all circumstances the award of attorney fees. Many factors could affect this result. The trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser.

*Id.* at 201.

In the present case, the court already has determined that Crucible is entitled to double damages notwithstanding the closeness of certain patent validity questions. For the reasons cited above by the court in support of such a finding, the court also concludes that this is an exceptional case under § 285 warranting an award of attorney fees. Specifically, now that it is clear that the actions of the adverse parties constituted willful infringement and not merely an acceptable aggressive strategy of contesting the patents, the court concludes that the costs resulting from this strategy should be borne by the parties who chose to pursue it, and not Crucible. Accordingly, the court finds that Crucible is entitled to an award of reasonable attorney fees under 35 U.S.C. § 285. The actual calculation of such attorney fees will be referred to a special master at the appropriate time.[13]

---

**13.** *See* Section V *infra.*

## III. MEASURE OF DAMAGES AND PREJUDGMENT INTEREST

In addition to the question of whether increased damages are appropriate, questions relating to the measure of damages and the appropriate rate of prejudgment interest are also at issue. Regarding the measure of damages, Crucible argues that it is entitled to the profits it lost due to the infringing sales of the adverse parties. On the other hand, the adverse parties assert that Crucible cannot make the showing necessary for an award of lost profits. Instead, they argue that Crucible is only entitled to a royalty in the form of a specified percentage of the sales of the infringing products.

It is well-settled that "[i]n order to recover lost profits a patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer." *Del Mar*, 836 F.2d at 1326. In addition, where "the patent owner and the infringer were the only suppliers of the patented product, it is reasonable to infer that the patent owner would have made the sales made by the infringers." *Id.* at 1327 (*citing Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983)).

The adverse parties argue, however, that such an inference would not be proper in the present case because there existed acceptable noninfringing substitutes to PM high speed steel products and because Crucible lacked the capacity to make the infringing sales. The court agrees that these allegations necessitate further inquiry.

The adverse parties' allegations relate to two prongs of the *Panduit* test, accepted by the Federal Circuit in *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573 (Fed.Cir.1983), as a proper method of proving entitlement to lost profits. In *Panduit Corp. v. Stahlin Bros. Fibre Works*, the court indicated that the burden is on the patent holder to prove: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufac-

turing and marketing capability to exploit the demand, and (4) the amount of the profits he would have made." 575 F.2d 1152, 1156 (6th Cir.1978) (citations omitted); *Central Soya*, 723 F.2d at 1578. The adverse parties seek an evidentiary hearing so that they can prove the existence of acceptable noninfringing substitutes and Crucible's lack of capacity to make the infringing sales. For the reasons set forth below, however, the court concludes that an evidentiary hearing is necessary only on the question of Crucible's capacity.

There is no controversy over the first prong of the test. The court finds that the substantial number of sales of the infringing products by the adverse parties is sufficient to show demand for those products. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed.Cir.1984).

Regarding the second prong of the test, the adverse parties allege that conventional high speed steel products were acceptable noninfringing substitutes for PM high speed steel products. The court believes, however, that the substantial evidence presented at the liability stage of this proceeding relating to prior art and validity of the patents-in-suit, as well as the court's earlier findings on such issues, sufficiently establish the absence of noninfringing substitutes. Specifically, in discussing the validity of the *Holtz* patent-in-suit, this court earlier found that:

> We have considered all of the prior art references cited by the defendants with special attention to those primary sources; i.e. Mott; *Comstock* and *Reen I*, and have concluded that no prior inventor was able to achieve the requisite combination of high density and finely dispersed carbides necessary to the production of top quality high speed tool steel. Indeed, no prior inventor even regarded such a combination as theoretically possible.

> \* \* \* \* \* \*

> From our review of these references, we conclude that until the *Holtz* invention, those in the art were left with a choice between full density achieved through a high temperature process

which inevitably yielded undesirable coarse carbides, or a process which controlled carbide growth but which resulted in insufficient density. The *Holtz* process produced the desired combination of full density and fine carbide size necessary to the production of superior cutting tool steel.

> \* \* \* \* \* \*

> In conclusion ... the court finds that the *Holtz* invention was exactly what it purported to be; viz, the development of a new and previously thought unachievable, yet very desirable, method and process for obtaining the necessary and theretofore mutually exclusive properties of theoretical full density and finely dispersed carbides for use in high speed tool steels.

*Crucible*, 594 F.Supp. at 1257–58.

Regarding the *Steven* patent-in-suit, the court earlier found that:

> The principal benefit of the *Steven* process is in its elimination of the out-of-roundness traditionally characteristic in past methods of producing hobs. This, as we previously noted, is achieved through a hardening treatment phase which maximizes size change uniformity, a property particularly essential for hobs because of the reduction of out-of-roundness and resultant increased dimensional stability.

> \* \* \* \* \* \*

> The court finds that the long-felt need for the *Steven* invention is established by the previous consideration of the prior art. It is established that those in the art were unable to achieve a sufficient degree of dimensional stability to cope with the out-of-roundness problem inherent in hobs. Moreover, it appears that those who addressed the problem were in disagreement as to the cause. The *Steven* process is not only nonobvious, but appears to be revolutionary in its elimination of dimensional instability in hobs.

*Id.* at 1263.

Thus, the *Holtz* and *Steven* patents-in-suit revolutionized the industry by meeting long-felt needs and providing for previous-

ly unheard of advantages. "A product lacking the advantages of that patented can hardly be termed a substitute 'acceptable' to the customer who wants those advantages." *Panduit*, 575 F.2d at 1162. Therefore, because of the unique combination of theoretical full density with finely disbursed carbides (*Holtz*) and the elimination of dimensional instability in hobs (*Steven*), the court concludes that there were no noninfringing substitutes for products made pursuant to the patents-in-suit.

The adverse parties argue that because high speed tool steel made according to PM technology has the same end uses as high speed steel made according to conventional technology, the latter is an acceptable noninfringing substitute for the former. The court does not agree.

In *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F.2d 1554 (Fed.Cir.1986), the Federal Circuit affirmed the district court's conclusion that there were no acceptable noninfringing substitutes for the patented wheelbarrow. In so doing, the court rejected the infringer's argument that all wheelbarrows on the market were acceptable substitutes because they all "perform[ed] the *same function* of transporting a load contained in a bowl or tray on one wheel propelled by an operator holding the handles on which the bowl or tray is mounted and propelling the assembly on the single wheel." *Id.* at 1556 (emphasis in original). Rather, the court upheld the district court because the other wheelbarrows incorporated only some, but not all, of the elements of the patented wheelbarrow. *Id.*

Similarly, in the present case, even if the court accepts the assertion that PM and conventional high speed steel products had the same end uses and performed the same functions, this does not establish that the latter is an acceptable noninfringing substitute for the former in light of the unique advantages found in PM products.[14] Accordingly, the court concludes that the sec-

ond prong of the *Panduit* test has been satisfied.

■ Unlike the issue of noninfringing substitutes, however, Crucible's manufacturing and marketing capacity to exploit the demand evidenced by the sale of infringing products has not been the subject of earlier proceedings before this court, either directly or indirectly. Nor is it a question of law capable of resolution without the need for a factual inquiry. Therefore, the issue of Crucible's capacity to make the sales that were made by the adverse parties will be set down for an evidentiary hearing.

In light of the possibility that lost profits may not be the appropriate measure of damages, the parties should be prepared to submit evidence at the hearing regarding what percent of the sales of the infringing ASP products would constitute a reasonable royalty rate. If after the hearing the court finds that Crucible has met its burden of proving capacity, the court will refer the fourth prong of the test—the calculation of the amount of profits Crucible would have made—to a special master as agreed upon by the parties. If, however, Crucible fails to meet its burden, the court will determine a reasonable royalty rate and refer the actual calculation of damages based upon that rate to a special master.

Regarding the appropriate rate of prejudgment interest, the adverse parties argue that Crucible is entitled only to simple interest at the statutory rate of six percent (41 P.S. § 202) compounded annually, to correspond with the normal receipt of royalty payments. Crucible argues that it is entitled to interest at the rates that Crucible actually would have realized and paid over the period of infringement, with the compounding that would have occurred in the absence of the infringement.

In *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), the Supreme Court out-

---

**14.** Since the court is assuming that PM and conventional high speed steel products had the same end uses and functions, the court's conclusion regarding the lack of acceptable noninfringing substitutes is entirely consistent with its earlier conclusion regarding the functional interchangeability, as of 1971, between PM and conventional high speed steel products for purposes of relevant product market analysis. *See* Section I, *supra*.

lined the general principles supporting an award of prejudgment interest under 35 U.S.C. § 284. The Court stated:

> The standard governing the award of prejudgment interest under § 284 should be consistent with Congress' overriding purpose of affording patent owners complete compensation. In light of that purpose, we conclude that prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment.

461 U.S. at 655–56, 103 S.Ct. at 2062–63 (footnote omitted).

Crucible argues that the six percent statutory rate will be insufficient to afford complete compensation since the average yield on Certificates of Deposit during the period of infringement when it was a short term investor exceeded six percent and the average rate of interest during the period of infringement when it was a net borrower also exceeded six percent.

Under § 284, a "district court may 'fix' the interest and select an award above the statutory rate ... or select an award at the prime rate." *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir.1983) (footnote and citations omitted). In addition, if a "claimant has affirmatively demonstrated that a higher rate should be used ... the district court may fix interest at that higher rate." *Id.* at 1066. In that case, the Federal Circuit affirmed the district court's awarding prejudgment interest at the prime rate based upon a finding that

the patent owner affirmatively demonstrated that it borrowed money at or above the prime rate. *Id.*

■ In the present case, the court concludes that if Crucible can affirmatively demonstrate to the special master that the rates that it actually paid for money borrowed during the period of infringement, or that it could have realized from investments it would have made during the period of infringement, exceeded the state statutory rate, Crucible will be entitled to such rates, with the compounding that would have occurred absent the infringement. If, however, Crucible cannot make such a showing, the state statutory rate of six percent, compounded annually, will be the appropriate rate. In either event, the actual calculation of prejudgment interest will also be referred to the special master.

## IV. JOINDER OF KLOSTER SPEEDSTEEL AB AND SPEEDSTEEL OF NEW JERSEY, INC.

■ The final issue which must be resolved at this time is Crucible's motion to join Kloster Speedsteel AB and Speedsteel of New Jersey, Inc. ("Kloster") to Civil Action 74–917 pursuant to Fed.R.Civ.P. 25(c).[15] Crucible seeks joinder at this time to facilitate the final stages of this litigation. The court finds that the bases for joinder were adequately set forth by the Federal Circuit in its decision affirming this court's denial of Kloster's request that the October 11, 1984, injunction enjoining infringement be modified to exclude applicability to "successors in interest and assigns." Specifically, the Federal Circuit stated:

> It is undisputed that Kloster was created immediately after conclusion of the trial and long before judgment, and that, before the court's decision, it purchased the facility Stora used to manufacture the products found to infringe. There has been no determination that Stora di-

---

**15.** Rule 25(c) reads as follows:

In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. Service of the motion shall be made as provided in subdivision (a) of this rule.

vested itself of its facilities for producing infringing products for the purpose of evading the effect of any possible injunction. Nor has it been determined that Kloster's effort to evade the injunction was for the purpose of gaining freedom to continue the infringement and force Crucible to a second lawsuit. Such purposes would of course not reflect the highest ethical standards of either the business community or the legal profession.

On September 4, 1984, i.e., fifteen days before the district court issued its opinion, Crucible moved to join Kloster as a party pursuant to Fed.R.Civ.P. 19(a) and 25(c).

The court's opinion issued September 19, 1984, indicated that infringement by Stora and its "successors in interest and assigns" would be enjoined. On October 5, 1984, Kloster appeared at a status conference and argued that it should not be joined as a party and that "successors in interest and assigns" should be deleted from the proposed injunction. On October 11, 1984, the court issued its injunction enjoining infringement by Stora and its "successors in interest and assigns." The court deemed it unnecessary to decide the joinder question. Kloster moved to modify the injunction by deleting "successors in interest or assigns" or by specifically excluding Kloster. In denying the motion, the court cited *Regal Knitwear Co. v. National Labor Relations Board*, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945) as authority for its use of "successors in interest and assigns." 226 USPQ at 846.

Kloster was not a party when the judgment was entered. Nonetheless, because it must be deemed a successor in interest or an assign, it is bound by the injunction and may for that reason appeal the refusal to modify it. *See* 9 J. Moore, B. Ward & J. Lucas, *Moore's Federal Practice* 203.06 at 3–23 (1985); *see, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 108–112, 89 S.Ct. 1562, 1568–1570, 23 L.Ed.2d 129, 161 USPQ 577, 580–82 (1969); *see also United States v. LTV Corp*, 746 F.2d 51, 53–54 n. 5 (D.C.Cir.1984).

Kloster attempted to carry water on both shoulders before the district court. It effectively asserted it was not bound, when it contested joinder, declined intervention, and sought specific exclusion. It effectively asserted that it was bound, when it sought modification of the injunction, because absent such assertion Kloster would lack standing to contest the injunction's terms. In all events, the district court correctly intended that Kloster be bound by the injunction.

At the status conference, the court said, "the most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party and the judgment will be binding on his successor in interest, even though he is not named." (Quoting 7A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1958, at 664 (1972); *see also, Minnesota Mining & Manufacturing Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1263–64, 225 USPQ 350, 354–55 (Fed.Cir. 1985) (joinder merely a determination that transferee's presence would facilitate conducting the litigation)).

... The relation here is not disputable. Kloster is the successor-operator of Stora assets used to produce infringing products.

Kloster argues, however, that the district court "avoided giving any consideration to the relationship" between Kloster and Stora, did not "find" it in privity with Stora, did not give it a chance to show it was not in privity, and cannot bind it with Stora solely because it purchased Stora's infringing facility, citing an agreement between Kloster and Stora that Kloster accepted no liability for Stora's infringement. Kloster argues that it cannot be bound because it was not a party, disregarding its resistance to Crucible's motion to join it. Private agreements between Kloster and Stora are irrelevant. Kloster also argued that it should be entitled to litigate the case on

the merits before being enjoined. The arguments are spurious.

Courts have repeatedly found privity where, after a suit begins, a nonparty acquires assets of a defendant-infringer. *See, e.g., Brunswick Corp. v. Chrysler Corp.*, 408 F.2d 335, 338, 161 USPQ 65, 67 (7th Cir.1969); *J.R. Clark Co. v. Jones & Laughlin Steel Corp.*, 288 F.2d 279, 280, 129 USPQ 97, 98–99 (7th Cir.), *cert. denied*, 368 U.S. 828, 82 S.Ct. 49, 7 L.Ed. 2d 32 (1961); *Alb, Inc. v. Noma Lites, Inc.*, 231 F.2d 662, 663 USPQ 26, 27 (2d Cir.1956). The applicable reasoning was well illustrated in *J.R. Clark Co.*:

> If a third party may thus come into the acquisition of rights involved in pending litigation without being bound by the final judgment, and require a suit de novo in order to bind him, he might, pending that suit, alienate that right to another with the same result, and a final decree bearing fruit could never be reached.

288 F.2d at 280, 129 USPQ at 98 (*quoting G. & C. Merriam Co. v. Saalfield*, 190 Fed. 927, 932 (6th Cir.1911)).

Nowhere does Kloster appear to recognize that it can avoid the injunction by simply refraining from infringement. That it desires to continue Stora's infringement appears the only possible basis for its strenuous effort to evade the injunction.

The district court's denial of Kloster's motion to modify the injunction is affirmed.

*Kloster*, 793 F.2d at 1581–83.

For the foregoing reasons, the court finds that Kloster, the undisputed successor-operator of Stora assets used to produce infringing products, should be joined under Fed.R.Civ.P. 25(c).[16] Such joinder is fully consistent with Kloster's procedural due process rights since "the transferee's right to a hearing under the due process clause is limited to a determination of whether he is a successor in interest and thus liable on the judgment, and not wheth-

er he committed the acts with which the transferor was charged." *Minnesota Mining*, 757 F.2d at 1264, (*citing, Panther Pumps & Equipment v. Hydrocraft, Inc.*, 566 F.2d 8 (7th Cir.1977)). Accordingly, Crucible's motion to join Kloster will be granted.

## V. SPECIAL MASTER

Unable to reach an agreement on the selection of a specific special master, the parties have each submitted the names of three nominees in alphabetical order (so as not to indicate which party is responsible for nominating a particular candidate). Since the lost profits issue remains outstanding notwithstanding this opinion, the court will not, at this time, indicate its selection. Rather, the court will announce its selection, and issue an appropriate order of reference, after a determination has been made regarding the availability of lost profits as the measure of damages.

An appropriate order will follow.

### ORDER OF COURT

AND NOW, this 5th day of December, 1988, for the reasons stated in the court's opinion of this date, IT IS ORDERED that Crucible's motion for partial summary judgment dismissing the antitrust counterclaims be, and the same hereby is, granted; and,

IT IS FURTHER ORDERED that Crucible's request for increased damages under 35 U.S.C. § 284 be, and the same hereby is, granted insofar as Crucible is awarded double damages; and,

IT IS FURTHER ORDERED that Crucible's request for attorney fees under 35 U.S.C. § 285 be, and the same hereby is, granted; and,

IT IS FURTHER ORDERED that decision on Crucible's request for lost profits as the measure of damages be, and the same hereby is, deferred until after an evidentiary hearing can be held on the issue of Crucible's capacity to supply patent-

---

**16.** Crucible also moved for joinder pursuant to Fed.R.Civ.P. 19(a). However, because the court finds joinder proper under Rule 25(c), it is un-

necessary to address Crucible's motion under Rule 19(a).

ed products in place of the infringing ASP products during the period of infringement; and,

IT IS FURTHER ORDERED that decision on the parties' joint motion for order of reference to a special master be, and the same hereby is, deferred until after the court has resolved the question of Crucible's ability to recover lost profits; and,

IT IS FURTHER ORDERED that Crucible's request for prejudgment interest in excess of the state statutory rate be, and the same hereby is, granted to the extent Crucible is able to affirmatively demonstrate that the rates that it actually paid for money borrowed during the period of infringement, or that it could have realized from investments it would have made during the period of infringement, exceeded the state statutory rate; and,

IT IS FURTHER ORDERED that Crucible's motion to join Kloster Speedsteel AB and Speedsteel of New Jersey, Inc. to Civil Action 74–917 be, and the same hereby is, granted.